E-FILED
Wednesday, 15 January, 2020  10:04:01 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| LORI HOLMES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 17-CV-2318 |
| | ) | |
| BOARD OF EDUCATION OF KANKAKEE | ) | |
| SCHOOL DISTRICT #111, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER

Plaintiff, Lori Holmes, filed her Amended Complaint (#2) in the above matter on January 24, 2018, alleging that she was discriminated against on the basis of race and gender in violation of Title VII of the Civil Rights Act (42 U.S.C. § 2000e, et seq.) and the Illinois Human Rights Act (IHRA) (775 Ill. Comp. Stat. 5/1-101 et seq.).  Defendant, Board of Education of Kankakee School District #111, filed its Motion for Summary Judgment (#36) on October 17, 2019, to which Plaintiff filed her Response (#41) on November 19, 2019.  Defendant filed its Reply (#42) on November 26, 2019.  For the following reasons, Defendant's Motion for Summary Judgment (#36) is GRANTED.

BACKGROUND

The following background is taken from Defendant's Undisputed Statement of Material Facts, Plaintiff's Additional Facts, and Defendant's response to Plaintiff's Additional Facts.  Only facts that have support in the record are presented as

background.  The court will note where the fact presented is better characterized as a "claim" or "argument" of a party, and will also note where a party disputes a claimed fact, if the basis for the dispute has support in the record.

*Plaintiff's Hiring*

Plaintiff, an African-American woman, states in her affidavit that she is a highly educated and highly qualified educator.  Dr. Genevra Walters, also an African-American woman, has been the Superintendent of Kankakee County School District #111 ("the School District") since the 2014-2015 school year.  The School District is a K-12 Illinois public school district comprised of ten schools, which include a high school, junior high school, two middle schools, five elementary schools, and one alternative school.

Among the responsibilities delegated to Dr. Walters as Superintendent was the responsibility of making hiring recommendations for the 2014-2015 school year.  Among these hiring determinations was the decision to recommend Plaintiff to the position of Principal at Lafayette, an elementary school, effective for a one-year term from August 1, 2014, to June 30, 2015.  She was later extended for another one-year term for 2015-2016.

At the time of the 2014 recommendation to hire Plaintiff, Lafayette had been designated by the Illinois State Board of Education ("ISBE") as a low-performing school that was eligible for a state School Improvement Grant ("SIG").  Prior to Dr. Walters' becoming Superintendent, the School District had applied and qualified for SIG funding.  As part of this funding, the School District was required to hire a new

2

Principal for Lafayette (the position for which Plaintiff was selected) and Lafayette was to be run autonomously and separately from other schools within the School District.

*"Repurposing" of Kankakee Elementary Schools*

After the 2014-2015 academic year got underway, it became evident to Dr. Walters that there were problems fostered by the administration of a grant that isolated one school and selected it for different treatment than other schools in the K-12 District. Carving out special management, administrative, and budgetary schemes for one school was unwieldy and did not prove to be in the best interests of the overarching goals and objectives at the School District.

When Dr. Walters started in her position, a $6 million deficit was plaguing the School District.  Plaintiff disputes that the $6 million deficit was in 2014-2015, pointing to a September 15, 2015, Kankakee Daily Journal article stating that the School District faced a $6 million deficit for the *upcoming* 2015-2016 fiscal year.  However, the article does go on to acknowledge that the district had been operating under a deficit budget since the 2012-2013 fiscal year, and thus it does not necessarily contradict Dr. Walters' statement that the School District faced a $6 million deficit in 2014.

In conjunction with Defendant School Board and other School District administrators, Dr. Walters developed a cost-savings plan to restructure the Kankakee schools.  This plan included closing two schools, including Lafayette, and reorganizing the K-3 elementary schools into single grade centers.  Prior to exercising its power of restructuring and establishing new grade centers, pursuant to School Board Policy 2:20, the School District held public forums for the community.

3

At a September 28, 2015, forum, Dr. Walters demonstrated how the restructuring could result in significant cost-savings.  On November 9, 2015, after a full and thorough examination of the issues of restructuring, Defendant voted on the first step in implementing the restructuring of the School District, which included reorganized grade centers. Defendant also passed a resolution to close Aroma Park Primary School as part of the restructuring.

At the time the initial restructuring plan was being implemented, Dr. Walters was involved in discussions with administrators from the ISBE concerning phasing out SIG funding at Lafayette, in anticipation of Lafayette's upcoming closure.  Although Defendant would not be able to eliminate the SIG funding during the 2015-2016 academic year because Lafayette's personnel contracts  extended through the end of the school year, Dr. Walters anticipated moving all elementary school students enrolled at Lafayette to the new grade centers for the 2016-2017 school year.  With the closure of Lafayette, the building would be repurposed as an alternative school.  The discussions related to repurposing Lafayette were a matter of public discussion, about which Plaintiff was on notice.  In fact, on November 17, 2015, Plaintiff sent out a letter to all Lafayette families in which she notified them of a meeting concerning the repurposing of Lafayette School.  Plaintiff objects to Defendant's assertion that she was on "notice," citing to "Def. Exhibit 10[,]" however there is no Defendant's Exhibit 10.  On November 30, 2015, Defendant approved the repurposing of Lafayette Primary School.

4

The three schools slated to be transformed into grade centers were Taft, which would house kindergarten and first grade, Mark Twain, which would house second grade, and Edison, which would house third grade.  With this model, students of one grade level and their teachers would be grouped together to promote consistency and coordination in the delivery of peer level instruction.

With this reorganization came an exploration of who would best serve the leadership needs of each grade center.  At the time of the reorganization planning, Cheryl O'Leary was the Principal at Taft, Jenny Way was the Principal at Mark Twain, and Dr. Kathleen O'Connor was the Principal at Edison and Aroma Park.  As the principals and Dr. Walters matched skill sets, they all agreed that it would serve the best interests of the School District if O'Leary moved to Edison and Dr. O'Connor moved to Taft.  Jenny Way would remain in place at Mark Twain, as she had served as Mark Twain Principal for a number of years already and had worked to develop it into a dual-language magnet school.

Dr. Walters avers that she reassigned Dr. O'Connor to Taft and O'Leary to Edison based on the needs of the students and the particularized skills and experience of the Principals.  Because Dr. O'Connor had served the School District for over 20 years, longer than any other principal in Kankakee, it was determined that it would be best for her to head up Taft Primary School, which would have the largest enrollment and the youngest children.  The current Taft principal, Cheryl O'Leary, had recognized strengths applicable to the older primary students, including significant experience with standardized testing, which is first administered in the third grade.  The

administration of standardized testing requires training, knowledge of required protocols, experience, and the ability to compile and analyze data, all skills with which O'Leary was equipped.

With regard to the closing of Lafayette, Dr. Walters notified Plaintiff during the fall of 2015 that her job as Principal would be eliminated. At the time of the notification, Plaintiff was on a one-year contract that expired on June 30, 2016. Plaintiff, however, avers that when she asked Dr. Walters about the status of her job as Principal, Walters said "I don't know yet." When Dr. Walters told Plaintiff that her position at Lafayette was going to be eliminated, Dr. Walters asked Plaintiff if she would be interested in an Assistant Principal vacancy at the High School. Because of employee grievance issues against Plaintiff, Dr. Walters believed that it would benefit Plaintiff to work under the mentorship of another building administrator. However, Plaintiff rejected the offer of an Assistant Principal position.

*Grievances Against Plaintiff*

In mid-October 2015, Plaintiff became the subject of a formal grievance initiated by the faculty members working at Lafayette Primary School, through their collective bargaining unit, the Kankakee Federation of Teachers ("KFT"). Complaints about Plaintiff's management style began surfacing from faculty members at Lafayette Primary School. They claimed that Plaintiff had been threatening and bullying staff, which had created an unsafe and hostile working environment. With regard to this pattern and practice of hostile behavior, the faculty filed a formal grievance, pursuant to the KFT collective bargaining agreement. The grievance was submitted to Assistant

6

Superintendent for Human Resources John Thomas, who asked Assistant Superintendent Felice Hybert to work with him, as Plaintiff's supervisor, in processing the grievance. Over a period of almost one month, spanning late October through November of 2015, Thomas and Hybert investigated the complaints, interviewed complaining parties, and strived to reach an amicable resolution.

On November 10, 2015, Thomas and Hybert met with the Lafayette staff, who raised a significant number of complaints about the hostile work environment that had been created by Plaintiff at the school. Thomas and Hybert discussed the complaints with Plaintiff, who requested an opportunity to respond in writing. On November 16, 2015, Plaintiff delivered her written response in which she essentially denied all claims against her.

As the grievance facilitator, Thomas set up a plan of action to move forward to come to a resolution that was agreeable to both sides. This plan included a proactive management endeavor to be initiated by Plaintiff that required her to: (a) make every effort to avoid pulling teachers away from classroom instruction for meetings that could be held before or after school; (b) develop and communicate a schedule for her availability for teachers; (c) routinely meet with the union leadership to problem solve proactively; (d) communicate to staff an appropriate chain of command in her absence; (e) utilize the permanent substitute in the capacity as required by the grant; (f) make it a priority to respond to emails targeting a 24-hour turnaround; (g) ensure that teachers receive the support needed to provide a solid instructional program; and (h) create an environment that is safe and free of bullying or retaliation by working closely with

teachers and staff in a collective effort to improve student learning.

     During the early part of February 2016, Plaintiff expressed concern about the many complaints that had been leveled against her by the Lafayette faculty members. She shared with Hybert that she was not happy at the School District.  In response, Hybert asked Plaintiff if she had considered looking for a job at another school district. In fact, according to Hybert, Plaintiff had told her the previous fall, during the period when the repurposing of Lafayette Primary School had become a matter of discussion at public forums, that she had been looking for another job.  Pursuant to these discussions, on February 5, 2016, Hybert provided Plaintiff with a letter of recommendation that she could use in a job search.

     On February 16, 2016, about two and a half months after a resolution to the initial grievance had been mediated, another complaint was submitted against Plaintiff, this time by a pregnant faculty member.  The faculty member claimed that on February 11, 2016, she was subjected to embarrassing comments related to her pregnancy in front of parents and staff.

     Plaintiff was allowed the opportunity to rebut and refute any of the complaints raised against her.  Plaintiff claims she was never interviewed about the allegations.

Further, to the extent Plaintiff believed she was the subject of harassment or discrimination, she never invoked the protection of Board Policy 5:20, Workplace Harassment Prohibited, which was available to her.

*Plaintiff's Performance Evaluations*

Felice Hybert is an Assistant Superintendent with the School District.  As an administrator, Hybert holds a professional educator license with a Type 75 endorsement, which qualifies her to evaluate licensed personnel.  During the 2015-2016 school year, Hybert was assigned to evaluate four principals at Kankakee, including Plaintiff, who at the time was Principal of Lafayette Primary School.

With regard to Principal evaluations, the Illinois School Code sets forth a specific timeline that must be followed.  At the beginning of the 2015-2016 school year, Assistant Superintendent Thomas held an evaluation training session at which all Principals and Assistant Principals received written notice of the evaluation plan.  Plaintiff was included in the training session.  It was after that training session that Felice Hybert contacted Plaintiff to set up an initial collaborative goal-setting meeting.

On October 1, 2015, Hybert met with Plaintiff for the goal-setting meeting and together they filled out the Student Growth Goal Planning Sheets.  On December 16, 2015, Hybert undertook a formal observation of one of Plaintiff's staff meetings, pursuant to the requirements of the evaluation plan.  In her observations, Hybert noted that Plaintiff seemed to be reaching out to ask for staff input and to develop a shared vision of high expectations.

On January 12, 2016, Hybert contacted Plaintiff and provided her with a copy of the Self-Assessment Rubric for evaluation.  Pursuant to the evaluation plan, Hybert notified Plaintiff that she needed to complete the Rubric and return it to Hybert so that they could discuss it by February 1, 2016.  Plaintiff did not submit her Self-Assessment Rubric to Hybert by February 1, 2016.

On February 29, 2016, Hybert conducted a formal observation of Plaintiff, pursuant to the evaluation plan.  Plaintiff refused to sign the feedback notes.  That same day, Hybert met with Plaintiff to go over the administrative evaluation instrument Hybert had prepared.  Hybert assessed Plaintiff with a final numeric rating of 2.22, which falls within the "needs improvement" value.  Plaintiff finally submitted the Rubric to Hybert on March 28, 2016.  Plaintiff gave herself a final numeric rating of 2.25, which falls within the "needs improvement" value.

On March 29, 2016, the School District received a Vanderbilt Assessment of Leadership in Education Report for Plaintiff.  These reports are received for all Principals and are designed to provide a summary of the effectiveness of a Principal's learning-centered leadership behaviors, based on input from teachers, the principal's supervisor, and his or her own self-report.  Plaintiff's report showed that she did not complete the self-assessment portion and that the teachers' assessment of Plaintiff resulted in an overall score of 1.99, which falls within the "below basic" rating.

Dr. Walters avers that, with regard to Plaintiff's performance evaluation for the 2015-2016 school year, Plaintiff received a "needs improvement."  In her affidavit, Plaintiff responds that she did not prepare the performance evaluation, and she does not remember how she rated herself, but she is certain she gave herself a "positive numerical rating for 'student growth,' because student growth at Lafayette Primary School was very good."

The evaluation in question is attached as Exhibit 6-L to Defendant's motion.  The evaluator is listed as Felice Hybert, Assistant Superintendent.  Plaintiff did receive a 3.00 "Standards Rating Average," which would place her in the "Proficient" category. However, she received a 0.00 rating in the "Student Growth Rating," which gave her a "Final Numeric Rating" of 2.25, which placed her in the "needs improvement" category.

*Taft Vacancy*

In the fall of 2015, Assistant Superintendent John Thomas gave Dr. Walters notice that he had been offered a position as Superintendent of Schools at Pembroke Consolidated School District No. 259 for the 2016-2017 school year.  Dr. O'Connor, who had been at the School District for over 20 years, was one of the candidates to fill Thomas' position.  In February 2016, Dr. Walters recommended that Dr. O'Connor be appointed to the Assistant Superintendent position starting on July 1, 2016.  As incoming Assistant Superintendent for Human Resources, Dr. O'Connor was assigned to work with Thomas to facilitate and support the administration and staff through the restructuring process.  Dr. O'Connor was chosen to fill the Assistant Superintendent vacancy.

With Dr. O'Connor's appointment to the position of Assistant Superintendent, a vacancy opened up for the position of Principal at Taft Primary School for the 2016-2017 school year.  Plaintiff suggested to Dr. Walters that she should automatically be placed in this vacancy.  Dr. Walters notified Plaintiff that she was welcome to put in her application, but she did not have an automatic right to fill this vacancy.

In her new role as Assistant Superintendent, Dr. O'Connor, with Thomas' guidance, put together a hiring committee to screen and interview candidates for the Taft vacancy.  The hiring committee consisted of current Taft Principal Cheryl O'Leary; outgoing Assistant Superintendent for Curriculum Laura Fisher; Taft teachers Lisa Brown and Lisa Cullens; Hybert; and Dr. O'Connor.  The Human Resources Department screened all of the candidates' applications and weeded out any candidates who did not have the necessary qualifications.

To qualify for consideration for the vacancy, candidates had to have a professional educator license, which includes an administrator's Type 75 endorsement and a master's degree.  The candidate was also required to have prior experience as a Principal or Assistant Principal in a public school.

The Human Resources Department sent the hiring committee eight candidates to interview.  Plaintiff was among the candidates.  The committee received the candidates' applications, which gave details of past experience and educational qualifications.  The committee had a list of questions that were set out on a template, which could be used by the interviewers to take notes.  Every candidate was asked the same questions. There was a suggested grading scale from 1 to 5 that the interviewers could use to keep

12

track of their reactions to the candidates, but it was not mandatory that the interviewers use the scale.

For the Taft vacancy, the committee interviewed three candidates on February 25, 2016, and five candidates on March 3, 2016.  The hiring committee discussed all of the candidates and came to an agreement on the top two, and forwarded those names to Dr. Walters for a final interview.

Plaintiff, in her Complaint, alleged that her interview was a "sham" because Laura Fisher was present at her interview, but not the other candidates' interviews.  Fisher was only able to participate in Plaintiff's and another candidate's interview on February 25, 2016, because she had been in a serious car accident and was in a wheelchair, and she could not be at the other interviews due to her medical condition.  Plaintiff attests that Fisher was inattentive at this interview, seldom looking up from her phone.  Defendant disputes Plaintiff's assertion, citing to the notes Fisher took during the interview.

Dr. O'Connor avers that Plaintiff's interview was not strong, and that Plaintiff did not provide specific answers to questions, even though she had been at the School District for a year and a half at the time of the interview.  Dr. O'Connor was surprised and concerned by Plaintiff's answer to a question regarding a recent incident that required quick reaction and judgment on Plaintiff's part.  Plaintiff described an incident during which she called the police in response to some irate parents.  O'Connor avers that it is highly unusual that a principal would call the police to come to the school to assume control over a parent, particularly since Plaintiff did not provide any facts that

13

suggested criminal conduct that would warrant police intervention.

After all eight candidates were interviewed, the hiring committee selected two finalists. One of them, Kristen Smith, a white female, made a strong showing. Smith had a co-teaching background, which serves well in a collaborative environment and can accelerate and facilitate educational assistance at an early stage. She had special education experience and had done a lot of work related to intervention with students, which is invaluable in initiating proactive remediation. She had also worked as a Principal and Assistant Principal for the past five years.

A second finalist, Terrence Lee, an African-American male, demonstrated that he was good at communication. Dr. O'Connor attests that this quality works well with young children and their parents. He had an undergraduate degree in special education and a masters in educational leadership. Lee had experience with PBIS, the "Positive Behavioral Intervention System," which identifies student needs in a proactive manner, especially important when a school has 300 five- and six-year olds that require structure to control. Lee had experience in identifying, observing, and utilizing positive intervention systems to address student needs. Lee's background in data-based decision making and improved instructional practices was applicable. His experience that demonstrated effective collaboration with diverse families and staff was something that all members of the hiring committee found to be particularly suitable for Kankakee. The committee also found Lee to be highly qualified, with over six years of experience as a Principal and Assistant Principal in another Illinois school district.

Dr. Walters ultimately recommended that Lee be hired. Dr. O'Connor attests

that the hiring committee did not take race or gender into account in deciding on its two finalists.  Plaintiff was on a one-year contract that expired on June 30, 2016.  She had no tenure rights in her position.  Furthermore, she had been the subject of numerous complaints from the faculty members at Lafayette and had not shown independent leadership skills that would demonstrate the skills necessary to serve the kindergarten/first grade center that would be housed at Taft Primary.  Dr. Walters selected Lee, an African-American male, who she assessed as having an excellent background, an outgoing demeanor, and a strong management style, which seemed perfectly suited to what Dr. Walters was looking for to lead Taft Primary School.  Dr. Walters determined that Lee was the most qualified person to fill the Taft vacancy.

*Plaintiff and Other Principals*

Dr. O'Connor began at Kankakee in 1993 and taught for two consecutive yearly terms as a full-time teacher without receiving notice of dismissal.  To gain tenure status at the time she began teaching, the Illinois School Code simply required that a teacher complete two consecutive full year terms to gain tenure status.  Therefore, Dr. O'Connor gained tenure status in 1995.  She was continuously employed by Kankakee as a licensed educator since that time, in a variety of positions.

By contrast, Plaintiff was not tenured, and at the time her contract was not renewed in March 2016, Plaintiff had only worked at the School District for eighteen months under two separate one-year contracts beginning in August 2014.

In reviewing personnel records for administrative appointments recommendations made by Dr. Walters to Defendant on March 23, 2015, for the 2015-2016 school year, it is a matter of record that, at the time of her honorable dismissal in March 2016, Plaintiff was employed on a one-year contract that would expire on June 30, 2016.  Additionally, while Aroma Park, where Dr. O'Connor served as principal, was scheduled to close at the end of the 2015-2016 school year, the other school where Dr. O'Connor served as Principal, Edison Primary, was scheduled to remain open.  Dr. O'Connor's job as Principal at Edison Primary was not eliminated.  Plaintiff was serving as Principal at Lafayette Primary, which was going to be closed at the end of the 2015-2016 school year, so her position, along with other positions at that school, were going to be eliminated.

Regarding Principal O'Leary at Taft, who was reassigned to be Principal of Edison for the 2016-2017 school year when Dr. O'Connor was promoted to Assistant Superintendent, Taft Primary School was selected to remain open for the 2016-2017 school year, so O'Leary's Principal position was not eliminated.

Concerning Dr. O'Connor's promotion to Assistant Superintendent, Dr. O'Connor applied for the vacancy.  She went through the application process and competed with a number of other candidates.  When she received the appointment, that appointment created a vacancy for the Principal position at Taft.  The process to fill the

16

Taft vacancy was the same as that used to fill the Assistant Superintendent vacancy,

although Plaintiff disputes this.

*Plaintiff's Discharge*

On March 29, 2016, at the regularly scheduled March School Board meeting, Dr.

Walters presented a recommendation to Defendant that Plaintiff be honorably

discharged from her position as Principal of Lafayette at the end of the school year, in

that Lafayette was being repurposed and her job was being eliminated.  Additionally,

Dr. Walters made a recommendation for a Resolution of Honorable Dismissal of other

SIG employees whose jobs, like Plaintiff's, were being eliminated due to Lafayette's

closing.

Dr. Walters was the School District administrator who had the authority to make

hiring and termination recommendations to Defendant.  She was responsible for

making the recommendation both to hire and discharge Plaintiff.  Defendant's hiring

procedures are in accordance with Board Policy 5:10- Equal Employment Opportunity

and Minority Recruitment.

*Plaintiff's Admissions*

Via her deposition, and because she does not dispute them, Plaintiff concedes the

following facts.

At the time she was honorably discharged from her position at Lafayette,

Plaintiff did not have tenure.  She also had no occasion to observe the white Principals

that she claims are similarly situated to her, and has no personal knowledge of their day

to day management of the schools at which they were assigned.  She acknowledges that

there are other African-American Principals at the School District at higher grade levels.

Plaintiff did not want to be demoted to an Assistant Principal position.  She did not suffer any harm to her employment status after the 2014-2015 school year, even though her evaluation process was not completed.

Lafayette Primary was closed at the end of the 2015-2016 school year and restructured to house the alternative school, which moved from another location.  Dr. Levy, the alternative school Principal, is African-American, and continued as Principal at the new location.

The conversation that Plaintiff had with Dr. Walters, wherein Walters stated that Plaintiff was not handling her responsibilities in the context of the pending grievances against her, was the only meeting at which Plaintiff felt Walters was harassing Plaintiff. Dr. Walters never made any comments related to Plaintiff's race.  Dr. Walters never used a racial epithet or anything of that nature.  Plaintiff could not identify any race-related specifications to support her claim that Dr. Walters, who is African-American herself, discriminated against Plaintiff on the basis of race.

Plaintiff was not given a suspension or warning or any type of discipline in response to the claims made by a pregnant teacher.  While she did feel discriminated against on the basis of race and sex, Plaintiff never filed an internal complaint.  Plaintiff never had any discussions with supervisors during which she made complaints about other employees being treated more favorably.  She is also familiar with Defendant's policy prohibiting workplace harassment, but never made any claims under it about her supervisors or about Felice Hybert or anyone else.  The policy was in effect when

18

Plaintiff worked at the School District and, as Principal, Plaintiff also knew there was an Equal Employment Opportunity Commission ("EEOC") policy in effect.

Although Plaintiff sent out notice to Lafayette families about an open forum on November 19, 2015, addressing the repurposing of Lafayette, Plaintiff did not attend and did not ask Dr. Walters about what would be going on at the forum. Although Plaintiff knew, following Defendant's November 30, 2015, unanimous vote, that Lafayette was going to be repurposed, she never registered any opposition to this action.

Plaintiff never provided a rebuttal to any of the issues raised in her evaluation for the 2015-2016 school year. With regard to the faculty grievance claiming a hostile work environment against Plaintiff, Assistant Superintendent Thomas, who is African-American, and Felice Hybert, came to Lafayette on November 10, 2015, to conduct an interview with the faculty. Plaintiff attests that the School District administration never interviewed her to get her perspective on the facts. However, Thomas and Hybert talked with Plaintiff after the interviews and shared faculty concerns. Plaintiff was asked to submit a response to the concerns. Plaintiff submitted a lengthy response. Plaintiff agrees that the grievance was investigated and resolved.

*Plaintiff's Affidavit*

Plaintiff attests that, during her time as Principal at Lafayette, "there were no issues to detract from her performance and the students demonstrated academic success." Defendant disputes this, citing documentation from Dr. O'Connor that testing data indicated that Lafayette student proficiency scores in reading declined 6% points between the 2013-2014 school year and the 2014-2015 school year, Plaintiff's first year as Principal. However, math proficiency did increase 3% points in that time. In Plaintiff's second year as Principal, 2015-2016, reading proficiency dropped another 3% points, while math proficiency declined 2% points from the previous year. A comparison chart from the 2015-2016 school year indicated that Lafayette had the lowest math proficiency in the district, and that it had the lowest reading proficiency in the district, except compared to one other school, Steuben Elementary School.

Dr. Walters was responsible for completing evaluations of Plaintiff during the 2014-2015 school year, but she failed to do so.

The SIG from the State of Illinois provided $1 million each year for three years for the improvement of Lafayette Primary School, until the district refused the money in the third year, 2016-2017. Defendant notes that, per Dr. Walters' affidavit, the money was refused for that year because Defendant had passed a resolution to repurpose Lafayette.

Plaintiff states, in her affidavit, that "[t]he teachers at Lafayette Primary School were motivated to complain about Plaintiff as Principal when their opportunity to earn extra money from the SIG was terminated by the district because they incorrectly

attributed the decision to Plaintiff."  Defendant argues that this fact should not be

considered, because it is purely speculation on Plaintiff's part, as Plaintiff cites no

specifics or source material for this fact, beyond her own unsupported assertion in her

affidavit.  See *Hedburg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 931-32 (7th Cir.

1995).

Plaintiff next attests that "[a] teacher at Lafayette Primary School, Jaimie

Hamilton, was a recognized leader as union representative, who boasted about having

'gotten rid of' Plaintiff's predecessor as Principal of Lafayette Primary School.  That

previous Principal was, like Plaintiff, an African-American woman."  Defendant argues

that this statement is hearsay, which is inadmissible as substantive evidence to be used

to oppose a motion for summary judgment.  "Evidence offered at summary judgment

must be admissible to the same extent as at trial, at least if the opposing party objects,

except that testimony can be presented in the form of affidavits or transcripts of sworn

testimony rather than in person."  *Baines v. Walgreen Co.*, 863 F.3d 656, 662 (7th Cir.

2017).  This includes hearsay statements, which are statements that "'(1) the declarant

does not make while testifying at the current trial or hearing; and (2) a party offers in

evidence to prove the truth of the matter asserted in the statement.'"  *Baines*, 863 F.3d at

662, quoting Fed.R.Evid. 801(c).  Here, Hamilton is not making the statement while

testifying at this trial or hearing, indeed it was not made under oath at all.  Thus, to the

extent Plaintiff is offering the statement in evidence to prove the truth of the matter asserted, namely that Hamilton "got rid of" Plaintiff's predecessor at Lafayette, it is barred as hearsay.

Plaintiff attests that she was treated unequally, and that this treatment embarrassed her in the Kankakee community.

The last item in Plaintiff's affidavit states: "Dr. Walters made a statement to the local press on or before February 9, 2016, explaining that three white elementary school principals would keep jobs as principals in the district's restructuring, but plaintiff, the district's only African-American elementary school principal, would need to apply for a vacant position."  Defendant argues that Dr. Walters' statement from the article is hearsay.  For the same reasons stated above in regard to Hamilton's statement, the court finds Walters' quote to be hearsay if submitted for the truth of the matter asserted. Further, having read the article, Plaintiff's attestation is misleading.  Dr. Walters said nothing about the races of Plaintiff or any of the other administrators or employees. There is nothing to suggest that Dr. Walters' statement was a "statement" issued "to the local media," but rather was an answer to a question posed.

*Procedural History*

Plaintiff filed her Amended Complaint (#2) in this matter on January 24, 2018. Count I alleges discrimination based on race in violation of Title VII in that: (1) in February 2016 Defendant restructured the administration of its public schools, and similarly situated white school principals were either transferred or promoted to other positions in the School District, but Plaintiff, the only African-American elementary

school principal, was required to apply and interview for an opening for which she was ultimately not selected; and (2) Defendant failed to evaluate Plaintiff's performance by the applicable rules, policies, and procedures, despite having done so for similarly situated white school administrators in the School District.  Plaintiff realleges the same claims in Count II, only this time pursuant to the IHRA.

Count III alleges harassment/hostile work environment on the basis of race, in violation of Title VII.  Plaintiff alleges that, in violation of Title VII, Defendant subjected Plaintiff to harassment "creating and constituting a hostile work environment because of Plaintiff's race to wit:" (1) beginning on February 9, 2016, Felice Hybert, Defendant's evaluator, "regularly hectored Plaintiff about whether Plaintiff had found another job yet,"; (2) on February 11, 2016, Defendant falsely accused Plaintiff of discriminating against a teacher at Lafayette; (3) Defendant issued a formal "grievance" against Plaintiff and then failed to investigate and/or handle the grievance in accordance with applicable rules, policies, and procedures; (4) Dr. Walters falsely stated that Plaintiff "could not handle" her job responsibilities; (5) Dr. Walters micromanaged Plaintiff's handling of grant funds specifically designated for the improvement of Lafayette school, notwithstanding Plaintiff's expertise in managing said grant; and (6) Defendant dismissed Plaintiff as Principal without lawful authority and in a manner which caused humiliation and embarrassment for Plaintiff within the Kankakee community.  Plaintiff realleges the same claims in Count IV, only this time pursuant to the IHRA.

In Count V, Plaintiff alleges discrimination on the basis of sex in violation of Title VII, in that Defendant hired a male candidate for the only school Principal vacancy, and did not hire Plaintiff.  Plaintiff also alleges that her interview was a sham, citing Fisher's inattentiveness to Plaintiff's statements.  Plaintiff further alleges, on information and belief, that her qualifications and experience were "manifestly superior" to those of the male candidate who was hired, and that this male candidate was not "subjected to the indignity of participating in a sham interview."

ANALYSIS

Defendant has moved for summary judgment, arguing that Plaintiff's Title VII racial discrimination and hostile work environment claims, as well as her Title VII sexual discrimination claims, are without merit.

*Summary Judgment Standard*

 Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for summary judgment, a district court "has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial."  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  In making this determination, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party.  See *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242, 255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  However, a court's favor toward the

24

nonmoving party does not extend to drawing inferences which are only supported by speculation or conjecture.  See *Singer*, 593 F.3d at 533.  In addition, this court "need not accept as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St. George Cmty. Consol. Sch. Dist. No. 258*, 688 F.Supp.2d 815, 835 (C.D. Ill. 2010) (emphasis in original).

The party opposing summary judgment may not rely on the allegations contained in the pleadings.  *Waldridge*, 24 F.3d at 920.  "[I]nstead, the nonmovant must present definite, competent evidence in rebuttal."  *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir. 2004).  Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events."  *Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).  Specifically, to survive summary judgment, the nonmoving party "must make a sufficient showing of evidence for each essential element of its case on which it bears the burden at trial."  *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

*Plaintiff's State Claims Under the IHRA*

As a preliminary matter, the court must address the fact that Plaintiff's claims have been brought pursuant to both the IHRA and Title VII, the IHRA's federal counterpart.  The basis for the IHRA racial discrimination claim in Count II is the same as the Title VII racial discrimination claim in Count I, and the basis for the IHRA racial harassment/hostile work environment claim in Count IV is the same as the Title VII

25

racial harassment/hostile work environment claim in Count III.  See Plaintiff's

Amended Complaint, Docket Entry #2, pp. 2-6.  Illinois courts apply the federal Title

VII framework to IHRA cases, and thus a claim brought under the IHRA can be

evaluated in the exact same manner as if it were brought under Title VII.  See *Volling v.*

*Kurtz Paramedic Services, Inc.*, 840 F.3d 378, 383-84 (7th Cir. 2016).  Therefore the court

will consider Counts I and II together, and Counts III and IV together, under the

Seventh Circuit's and U.S. Supreme Court's Title VII analyses.

*Counts I and II: Racial Discrimination Under Title VII and the IHRA*

Defendant argues that there is no evidence of racial discrimination, as: (1) there is

no evidence that Dr. Walters, who was the decisionmaker in this case, nor any other

School District officer or employee, ever made any racially offensive comments or any

reference to race whatsoever, or engaged in any conduct that would serve as a direct

admission of racial animus; and (2) Plaintiff can make no viable claim under the

burden-shifting approach that Defendant racially discriminated against her.  Plaintiff

responds that a jury could find that Defendant's reassignment of its three white

elementary school Principals without new applications and interviews, while its only

African-American elementary school Principal was left without a job despite a new

Principal position opening up, was discriminatory.

The Seventh Circuit recently stated, in regard to evaluating discrimination claims

under Title VII:

Title VII prohibits an employer from discharging an employee because of that person's race. See 42 U.S.C. § 2000e–2(a)(1).  A plaintiff may prove race discrimination either directly or indirectly, and with a combination of direct and circumstantial evidence.  The direct method requires the plaintiff to set forth "sufficient evidence, either direct or circumstantial, that the employer's discriminatory animus motivated an adverse employment action." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).  The indirect method allows a plaintiff to prove discrimination by using the burden-shifting approach articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See *Coleman*, 667 F.3d at 845.

In *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), we clarified that the "direct" and "indirect" methods are not subject to different legal standards. Courts should not sort evidence of discrimination "into different piles, labeled 'direct' and 'indirect,' that are evaluated differently." *Id.* at 766.  Instead, there is a single inquiry: it is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race ... caused the discharge." *Id.* at 765.  Our decision in *Ortiz* did not alter "*McDonnell Douglas* or any other burden-shifting framework, no matter what it is called as a shorthand." *Id.* at 766.

The *McDonnell Douglas* burden-shifting framework is designed to "sharpen the inquiry into the elusive factual question of intentional discrimination." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 255 n.8, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The plaintiff carries the initial burden of establishing a prima facie case of discrimination, which can be accomplished by setting forth evidence that: "(1) she is a member of a protected class, (2) her job performance met [the employer's] legitimate expectations, (3) she suffered an adverse employment action, and (4) another similarly situated individual who was not in the protected class was treated more favorably than the plaintiff." *Burks v. Wisconsin Dep't of Transportation*, 464 F.3d 744, 750–51 (7th Cir. 2006) (citation omitted).  Once established, this prima facie case creates a presumption of discrimination, and the "burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its employment decision. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. "When the employer does so, the burden shifts back to the plaintiff, who must present evidence that the stated reason is a 'pretext,' which in turn permits an inference of

unlawful discrimination." *Coleman*, 667 F.3d at 845, quoting *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817.

*McKinney v. Office of Sheriff of Whitely County*, 866 F.3d 803, 807 (7th Cir. 2017).

As noted above, although the Seventh Circuit, in *Ortiz* "exterminated 'the rat's nest of surplus 'tests'' in [discrimination] cases, rejected unhelpful distinctions between evidence, and emphasized that 'all evidence belongs in a single pile and must be evaluated as a whole[,]'" the court did leave the *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting test "as a viable option for pursuing employment discrimination claims." *Barbera v. Pearson Education, Inc.*, 906 F.3d 621, 628-29 (7th Cir. 2018), quoting *Ortiz*, 834 F.3d at 766. Indeed, where the parties organize their arguments in terms of the burden-shifting test, a district court may follow that framework in its analysis, keeping in mind *Ortiz*'s admonition to consider all the evidence as a whole. *Barbera*, 906 F.3d at 629-31; *de Lima Silva v. Department of Corrections*, 917 F.3d 546, 559-61 (7th Cir. 2019).

In the instant case, the parties use the *McDonnell-Douglas* burden-shifting test to organize their arguments, and the court agrees that the burden-shifting framework is useful in this case in analyzing Plaintiff's racial discrimination claim based on the arguments and evidence presented. Indeed, the entirety of Plaintiff's Response to Defendant's arguments on Counts I and II, at pages 5-7, concerns legitimate employment expectations, similarly situated comparators, and pretext, all aspects of the burden-shifting approach. The court would further note that Plaintiff cites no evidence of any racial discrimination outside of the burden-shifting approach context, such as

28

any comments or actions explicitly referencing race.  Therefore, the court will proceed under the burden-shifting analysis.

Before analyzing Plaintiff's claim under the burden-shifting approach, it is important to identify just what, exactly, Plaintiff is claiming as discrimination. Defendant argues, in its Reply brief, that Plaintiff's argument in her Response as to what "decision" of Defendant's she is referring to as discriminatory is "somewhat muddled."  The court, to a point, agrees with Defendant's statement.  Plaintiff, in her Amended Complaint, identifies racial discrimination based on: (1) being the only elementary school Principal, after the restructuring, who was required to apply and interview for an opening for which she was ultimately not selected; and (2) that Defendant failed to evaluate her performance by the applicable rules, policies, and procedures despite having done so for similarly situated white school administrators in the School District.  Plaintiff makes no argument in her Response, and has provided no competent evidence, concerning how the evaluation procedures were improperly applied to her versus white administrators in the School District.  Therefore, the court must consider this point abandoned or conceded.  Thus, the court will proceed under Plaintiff's theory of racial discrimination being that she was the only elementary school Principal after the restructuring made to apply for a Principal's job, a job for which she was not hired, when other similarly situated white Principals were not made to apply.

The court must first determine if Plaintiff can make a prima facie showing that she was discriminated against based on her race. This initial burden is on Plaintiff, and she must establish all four elements before the burden shifts to Defendant to offer a nondiscriminatory reason for the adverse action. *Vaughn v. Vilsack*, 715 F.3d 1001, 1006 (7th Cir. 2013). Plaintiff is African-American, and thus a member of a protected class, which meets the first requirement of the burden-shifting approach. See *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 709 (7th Cir. 2011). Defendant further concedes, arguendo, that "Plaintiff's honorable termination suffices to satisfy" the adverse employment action (third) element. Plaintiff must still satisfy the second and fourth elements of the burden-shifting approach.

The fourth element of the burden-shifting approach requires Plaintiff to identify another similarly situated individual who was not in the protected class who was treated more favorably than her. See *McKinney*, 866 F.3d at 807. To determine whether employees are similarly situated, courts ask "whether the other employees' situations were similar enough to the plaintiff's that it is reasonable to infer, in the absence of some other explanation, that the different treatment was a result of race or some other unlawful basis." *de Lima Silva*, 917 F.3d at 559, quoting *Luster v. Illinois Department of Corrections*, 652 F.3d 726, 730 (7th Cir. 2011). To be "similarly situated," co-workers must be directly comparable to the plaintiff in all material aspects, but they need not be identical in every conceivable way. *Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 802 (7th Cir. 2014).

Plaintiff argues that "[t]he white elementary school Principals who were reassigned to different schools without applying are sufficiently similar to plaintiff, who was also an elementary school principal in the same District, to be considered as comparators."  First, it should be noted that Plaintiff provides no details about the proposed comparators and makes no specific argument as to why they are similarly situated to her.  On summary judgment, Plaintiff cannot rely on mere legal conclusions unsupported by citation to the record, see *Nuzzi*, 688 F.Supp.2d at 835, but rather must present definite, competent evidence in rebuttal to Defendant's arguments.  See *Butts*, 387 F.3d at 924.  Blanket arguments that Plaintiff is similarly situated to every other elementary school Principal in the School District affected by the restructuring will not suffice.  See *Jones v. National Council of Young Men's Christian Assoc. of the United States of America*, 48 F.Supp.3d 1054, 1104-05 (N.D. Ill. 2014).  Rather, "[i]t is well established that a plaintiff must provide specific evidence and specific examples of employees who have been treated more favorably in order to establish this element."  *Dority v. City of Chicago*, 2001 WL 1155286, at *14 (N.D. Ill. Sept. 28, 2001).  Plaintiff has not done that here. Plaintiff has provided no evidence of the educational or professional background of the supposed comparators, or any evidence on their job performance or disciplinary/grievance record in the School District, to make a prima facie case as to why they are directly comparable to her in all material aspects.  See *Langenbach*, 761 F.3d at 802.

Defendant notes that the only possible comparator could be Dr. O'Connor, as she was the only other elementary school Principal whose school, Aroma Park, was being closed.  Unlike Plaintiff, Dr. O'Connor did not lose her job with the School District, but was instead promoted to Assistant Superintendent.  The court agrees with Defendant, however, that O'Connor and Plaintiff are not comparable.  Plaintiff was on a one-year contract that had expired on June 30, 2016, and was not tenured at the time of her discharge from the School District.  Dr. O'Connor, by comparison, had been an employee of the School District for 26 years, "had tenure rights and had achieved a legal property interest in her job at the School District."  The two are simply not comparable.  In any event, Plaintiff makes no effort, beyond a bare legal conclusion, to make an argument that any of the other elementary school Principals in the School District were similarly situated to her, which simply does not suffice at summary judgment.  See *Butts*, 387 F.3d at 924.

Even if Plaintiff could point to similarly situated comparators who did not suffer an adverse employment action, under the second element of burden-shifting, Plaintiff must still demonstrate that her job performance met Defendant's reasonable expectations.  See *McKinney*, 866 F.3d at 807.   Defendant argues that Plaintiff cannot meet her burden on this element because: she was the subject of multiple complaints from colleagues, including a formal Faculty Grievance submitted pursuant to the KFT collective bargaining agreement; she received a "needs improvement" on her 2015-2016 evaluation, and even rated herself as needing improvement; and the Vanderbilt

32

Assessment of Leadership in Education Reports showed that the teachers over whom she had supervision gave her a below basic rating.  Plaintiff responds that Dr. Walters did not announce the "musical chairs" practice of school closings and Principal reassignments to the media until February 9, 2016, and the negative evaluations of Plaintiff did not happen until after that date.  Plaintiff further argues that the evaluations were "rushed," and only completed on the same day Defendant met to dismiss Plaintiff from her position.  Plaintiff also notes that Dr. Walters failed to evaluate Plaintiff's performance during the 2014-2015 school year, when the evaluation would have been positive.

Plaintiff must show that she was meeting her employer's legitimate expectations at the time of her termination.  *Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 627 F.3d 596, 600 (7th Cir. 2010).  The adverse employment action at issue here occurred sometime around or after February 2016, when Plaintiff was informed by Dr. Walters that she would not automatically be hired on as Principal at Taft Elementary, but rather would have to apply for the position.  The formal grievance procedure had already been initiated by faculty members at Lafayette alleging Plaintiff bullied and threatened staff, creating an unsafe working environment, leading to an investigation.  Further, while math proficiency at Lafayette had increased 3% points from 2013-2014 to 2014-2015, reading proficiency declined 6% over that same time period.  Plaintiff offers no argument or evidence in rebuttal to the above facts.  The resolutions of the grievances filed against Plaintiff indicate that she had a poor managerial style as Principal, and did

not have a good relationship with her faculty. See *Mateu-Anderegg v. School Dist. of Whitefish Bay*, 304 F.3d 618, 626 (7th Cir. 2002) (plaintiff teacher was not meeting her employer's legitimate expectations based on ineffective teaching style, poor relationship with other staff members, failure to comply with expectations and responsibilities of being a teacher, and evaluations demonstrated concerns about her teaching style).

 The court finds that Plaintiff cannot demonstrate that she was meeting her employer's legitimate expectations at the time of the adverse employment action.

Plaintiff argues that she was meeting the School District's legitimate expectations, and that the entire reason for closing Lafayette, which led to the loss of her Principal position in the School District, was a pretext for racial discrimination. Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action. *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016). When assessing a plaintiff's claim that an employer's explanation is pretextual, the court cannot second-guess the employer's facially legitimate business decisions. *Lord*, 839 F.3d at 564. An employer's reasons for firing an employee can be foolish or trivial or even baseless, but as long as they are honestly believed, they are not pretextual. *Lord*, 839 F.3d at 564.

The court must note that Plaintiff's pretext argument does not appear to track with what she alleges to be the discriminatory act. Defendant, in its summary judgment motion, did not argue a legitimate non-discriminatory basis for its decision or pretext, but rather only that Plaintiff could not meet all the elements for a prima facie

discrimination claim.  Plaintiff, in her Response, claims that Defendant's reasoning for closing Lafayette and not Edison, Taft, and Mark Twain, was pretext.  However, Plaintiff, in her Amended Complaint and in her Response on the prima facie elements, claims that the discriminatory act was her *having to interview for a position for which she was ultimately not chosen*, instead of being automatically reassigned to a new Principal position.  Closing Lafayette during the restructuring, and not automatically reassigning Plaintiff to another Principal position, are two separate decisions.  Defendant's response to Plaintiff's pretext argument addresses an argument raised by Plaintiff, *i.e.* that the decision to restructure and close Lafayette was not a pretext to disguise racial discrimination.  Plaintiff's pretext argument should have concerned whether Defendant had a legitimate, non-discriminatory basis for reassigning the three white elementary school Principals, and whether such a given reason was pretext.

From the undisputed material facts, the court finds that such a legitimate basis existed.  With the reorganization of the schools, the School District explored who would best serve the leadership needs of each grade center.  Jenny Way would remain in place at Mark Twain, as she had served as Mark Twain Principal for a number of years already and had worked to develop it into a dual-language magnet school.  Dr. Walters avers that she reassigned Dr. O'Connor to Taft and O'Leary to Edison based on the needs of the students and the particularized skills and experience of the Principals. Because Dr. O'Connor had served the School District for over 20 years, longer than any other Principal in Kankakee, it was determined that it would be best for her to head up

Taft Primary School, which would have the largest enrollment and the youngest children.  The current Taft Principal, Cheryl O'Leary, had recognized strengths applicable to the older primary students, including significant experience with standardized testing, which is first administered in the third grade.  The administration of standardized testing requires training, knowledge of required protocols, experience, and the ability to compile and analyze data, all skills with which O'Leary was equipped.  Dr. Walters did offer Plaintiff an Assistant Principal position at the High School, as she felt it would benefit Plaintiff in the areas in which she had deficiencies. Upon Dr. O'Connor's promotion to Assistant Superintendent, Plaintiff was not automatically given the Taft position, and ultimately not hired for that position, due to Dr. Walters' concerns over the faculty issues and Plaintiff's leadership while at Lafayette.  Plaintiff has made no argument, and provided no evidence, to demonstrate that Dr. Walters' reasoning for reassigning those Principals was a lie.

However, as it is the pretext raised by Plaintiff, the court will also address the decision to restructure the elementary schools and close Lafayette school.  Assuming arguendo, that Plaintiff could show she was meeting her employer's legitimate expectations, Defendant responds to Plaintiff's pretext contention by claiming that the reason Plaintiff lost her job at Lafayette was because the restructuring plan eliminated Plaintiff's position, and there was no racial animus towards Plaintiff behind

36

Defendant's decision.  Plaintiff responds that this reason is pretext, because a jury could conclude that the "cost-savings" explanation for the restructuring was inconsistent with turning down the $1 million in state funding for which Lafayette had already qualified.

With regard to the Defendant's reasoning for repurposing Lafayette as a cost-saving measure being pretextual, Defendant notes Dr. Walters' affidavit wherein she avers that "there were problems fostered by the administration of a grant that isolated one school and selected it for different treatment than other schools in the K-12 District. Carving out special management, administrative, and budgetary schemes for one school was unwieldy and did not prove to be in the best interests of the overarching goals and objectives at the School District."  Thus, while cost-savings motivated part of the repurposing plan, clearly other factors included the problems caused by isolating Lafayette through the SIG, and that Dr. Walters and Defendant ultimately believed that it was not in the best interests of the overarching goals and objectives of the School District.

 Further weighing against Defendant's reasons being a pretext to obscure racial discrimination is the fact that Dr. Walters *offered Plaintiff the position of Assistant Principal* at the high school after informing her of Lafayette's impending closure. Plaintiff viewed this offer as a demotion, and refused it.  Dr. Walters averred that there was no racial animus on her part, and that she offered Plaintiff the Assistant Principal's position because she believed that, because of the employee grievances against her, it would benefit Plaintiff to work under the mentorship of another building administrator.

37

Plaintiff has not demonstrated a genuine issue of material fact that Defendant's stated reasoning for the decision to close Lafayette and eliminate Plaintiff's position is a "lie." See *Lord*, 839 F.3d at 564.

Finally, the court takes notice of the "same-actor theory," put forth by Defendant. Dr. Walters was the School District official who both hired Plaintiff and was responsible for elimination of Lafayette School, for Plaintiff's not being hired as a Principal at another elementary school in the School District, and for Plaintiff's eventual honorable dismissal. While it is not dispositive, the court may draw an inference in favor of Defendant based on the "same-actor" theory—that is, the theory that because the same person (here, Dr. Walters) both hired and fired Plaintiff, it is unlikely that she had a discriminatory motive. See *Blasdel v. Northwestern University*, 687 F.3d 813, 820 (7th Cir. 2012); *Harris v. Warrick County Sheriff's Dept.*, 666 F.3d 444, 449 (7th Cir. 2012).

Taking all of the evidence presented into account, the court cannot say that the evidence would permit a reasonable factfinder to conclude that the plaintiff's race caused her discharge. See *Ortiz*, 834 F.3d at 765. Thus, for the reasons stated above, summary judgment is granted in Defendant's favor on Counts I and II.

*Counts III and IV: Hostile Work Environment Based on Racial Harassment*

Plaintiff, in her Amended Complaint at Counts III and IV, alleges a hostile work environment based on racial harassment. Defendant's summary judgment motion argues that judgment should be entered in its favor on these counts because: (1) what Plaintiff described as harassment was the School District conducting investigations in

38

response to grievances, per policy; (2) Plaintiff admittedly never availed herself of
School District policies prohibiting workplace harassment; and (3) the allegedly
harassing conduct described by Plaintiff was not severe or pervasive enough to rise to
the level of a hostile work environment.

Plaintiff, in her Response, did not address Defendant's arguments on Counts III
and IV, and her failure to respond concedes the argument to Defendant.  See *Lacy v.
Progressive Insurance Co.*, 2016 WL 25717, at *2 (N.D. Ill. Jan. 4, 2016), citing *Alioto v.
Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is
the rule that a person waives an argument by failing to make it before the district court.
We apply that rule where a party fails to develop arguments related to a discrete issue,
and we also apply that rule where a litigant effectively abandons the litigation by not
responding to alleged deficiencies in a motion to dismiss." (citations omitted)); *Bonte v.
U.S. Bank, N.A.*, 624 F.3d 461, 466-67 (7th Cir. 2010) ("Failure to respond to an
argument—as the Bontes have done here—results in waiver....This leaves us no choice
but to accept U.S. Bank's assertions—supported as they are by pertinent legal
authority—that the allegations in the Bontes' complaint do not entitle them to relief.").

Even were the court to consider the claim, none of the evidence adduced
demonstrates that a reasonable factfinder could determine that Plaintiff was the victim
of a hostile work environment.  Harassment sufficiently severe or pervasive to alter the
terms and conditions of employment is actionable under Title VII as a claim of hostile
work environment.  *Cole v. Board of Trustees of Northwestern University*, 838 F.3d 888, 895

(7th Cir. 2016).  To prove a claim for hostile work environment based on race, an employee must show that: (1) she was subject to unwelcome harassment; (2) the harassment was based on her race; (3) the harassment was severe or pervasive so as to alter the conditions of the employee's work environment by creating a hostile or abusive situation; and (4) there is a basis for employer liability."  *Cole*, 838 F.3d at 895-96.  Hostile work environment claims are considered under the "totality of the circumstances approach."  *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016).  "Deciding whether a work environment is hostile requires consideration of factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance."  *Boss*, 816 F.3d at 920.  The court also looks to whether the conduct was directed at the victim.  *Lambert v. Peri Formworks Systems, Inc.*, 723 F.3d 863, 868 (7th Cir. 2013).

Simply put, there is nothing in the evidence that shows any sort of harassment was "severe or pervasive" enough to rise to the level of a hostile work environment. There is zero evidence of any race-based threats or intimidation or actions of any kind directed Plaintiff's way by Defendant or School District administrators.  Nothing in the record evinces any kind of frequent improper conduct directed Plaintiff's way, or "severe" conduct that was physically threatening, humiliating, or in any way interfered with Plaintiff's work performance.  See *Boss*, 816 F.3d at 920.  As stated above, the grievance was not "filed" by Defendant, it was part of a formal process and

investigation started following the filing of a faculty grievance pursuant to School District policy.  Suffice to say, Plaintiff puts forth no argument in her Response to identify what racial harassment (or any racial harassment, really) was so severe or pervasive to constitute a hostile work environment, so the court sees no need for further analysis on this issue.  Summary judgment is granted in Defendant's favor on Counts III and IV.

*Count V - Gender Discrimination Under Title VII*

In Count V, Plaintiff alleges that Defendant discriminated against her on the basis of sex when it hired Terrence Lee, a male candidate, for the Taft Principal vacancy, and did not hire her.  Plaintiff alleges that her interview was a sham and that her qualifications and experience were "manifestly superior" to Lee's, and that Lee was not subject to a "sham" interview like she was.

Defendant argues summary judgment should be granted in its favor on this count because there is not sufficient evidence that Plaintiff was better qualified than Lee.  Plaintiff responds that her interview was not conducted fairly, and that Laura Fisher, one of the interviewers, was present for Plaintiff's interview but not the others, and that Fisher was inattentive, "barely looking up from her phone."

The applicable standard at summary judgment is whether the evidence would permit a reasonable factfinder to conclude that gender discrimination caused the adverse employment action—here, the failure to hire for the Principal position at Taft. See *Barnes v. Board of Trustees of University of Illinois*, — F.3d —, 2020 WL 37682, at *3 (7th

Cir. Jan. 3, 2020).  Because the burden-shifting framework remains useful for focusing

the evidence, and Defendant uses it and Plaintiff, in a manner, responds to it, the court

will also apply that framework.  See *Barnes*, — F.3d —, 2020 WL 37682, at *3.

An employer's decision not to hire/promote an employee is discriminatory

when the employee establishes: (1) she was a member of a protected class; (2) she was

qualified for the position; (3) the employer rejected her application; and (4) the

employer hired/promoted someone outside the protected class who was not more

qualified for the position.  *Terry v. Gary Community School Corp.*, 910 F.3d 1000, 1006 (7th

Cir. 2018).

Jumping straight to the last element, it is clear from the record that Lee was just

as, if not more, qualified for the position of Principal at Taft as Plaintiff.  First, in terms

of Lee's qualifications, Dr. O'Connor avers that Lee was a good communicator, which

works well with young children, important for Taft, which would house kindergarten

and first grade.  Lee had an undergraduate degree in special education and a masters in

educational leadership.  Lee had experience with PBIS, the "Positive Behavioral

Intervention System," which identifies student needs in a proactive manner, especially

important when a school has 300 five and six-year olds that need structure.  Lee had

experience in identifying, observing, and utilizing positive intervention systems to

address student needs.  Lee's background in data-based decision making and improved

instructional practices was applicable.  His experience that demonstrated effective

collaboration with diverse families and staff was something that all members of the

hiring committee found to be particularly suitable for Kankakee.  The committee also found Lee to be highly qualified, with over six years of experience as a Principal and Assistant Principal in another Illinois school district.

By contrast, while Plaintiff was highly educated and had been a Principal for a year and a half at Lafayette, Plaintiff did not have a strong interview.  Furthermore, Dr. Walters noted that Plaintiff had been the subject of numerous complaints from the faculty members at Lafayette and had not shown independent leadership skills that would demonstrate the skills necessary to serve the kindergarten/first grade center that would be housed at Taft Primary.

Dr. Walters selected Lee, an African-American male, who she assessed as having an excellent background, an outgoing demeanor, and a strong management style, which seemed perfectly suited to what Dr. Walters was looking for to lead Taft.  Dr. Walters determined that Lee was the most qualified person to fill the Taft vacancy.

Plaintiff argues about one of the questions that Dr. O'Connor asked her during her interview regarding an incident at Lafayette where Plaintiff called the police to deal with some irate parents.  Plaintiff denies calling the police, and points to Dr. O'Connor's deposition where O'Connor did ultimately rate Plaintiff's answer on the question to be a "four" out of five, because O'Connor was happy with how Plaintiff won the parent over to her side.  Still, O'Connor testified that she disapproved of Plaintiff's actions in calling the police.  Plaintiff also argues that Lori Fisher, who attended her interview, was inattentive, looking at her phone.

43

The court finds Plaintiff's above arguments to be unavailing.  They are minor points, and do not address the key question of whether Plaintiff was better qualified than Lee for the Taft vacancy.  Further, the point about O'Connor loses its weight, as O'Connor testified she still found Plaintiff's answer to be a "four" out of five.

Based on the evidence, Lee was certainly qualified for the Taft vacancy.  Plaintiff may have been qualified as well, but she makes no arguments based on competent evidence as to her qualifications and how she was more qualified than Lee.  Rather, Plaintiff has made arguments about the "sham" interview process.  But, even taking Plaintiff's factual underpinnings of those arguments as true, they do not demonstrate that the interview and hiring process was a "sham" and that she was more qualified than Lee for the position.  A court is not a "super personnel department" that second-guesses employers' business judgments, and judicial intervention is permissible only if there is sufficient evidence of "unlawful hiring practices," particularly where an employer fails to hire or promote someone clearly better qualified than the person chosen.  *Riley v. Elkhart Community Schools*, 829 F.3d 886, 895 (7th Cir. 2016).  But that is not the case here, because there is not sufficient evidence that Plaintiff was clearly better qualified than the chosen candidate, Terrence Lee.  See *Riley*, 829 F.3d at 895.  Further, taking all of the evidence presented into account, the court cannot say that the evidence would permit a reasonable factfinder to conclude that the plaintiff's gender caused her to lose out on the Taft vacancy to Lee.  See *Ortiz*, 834 F.3d at 765.  Therefore, summary judgment is granted in Defendant's favor on Count V.

44

IT IS THEREFORE ORDERED:

(1)    Defendant's Motion for Summary Judgment (#36) is GRANTED.

       Judgment is entered in favor of Defendant and against Plaintiff.

(2)    The clerk is directed to MOOT all other pending motions.

(3)    The final pretrial conference scheduled for Friday, January 17, 2020, and

       the jury trial scheduled for Tuesday, February 11, 2020, are hereby

       VACATED.

       ENTERED this _____ day of _____, 2020.
                         15th              January

                          S/ COLIN S. BRUCE
                          U.S. DISTRICT JUDGE